UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
STEVEN PETRONIO,                          :
                                          :
        Plaintiff,                        :        19-cv-144 (JSR)
                                          :
        -v-                               :        OPINION AND ORDER
                                          :
NATIONAL RAILROAD PASSENGER               :
CORPORATION and STEVEN JOHN               :
COLLINS,                                  :
                                          :
        Defendants.                       :
------------------------------------- x

| **USDC SDNY** |
| **DOCUMENT** |
| **ELECTRONICALLY FILED** |
| **DOC #:** |
| **DATE FILED:** 0 2 20 |

JED S. RAKOFF, U.S.D.J.

On January 7, 2019, plaintiff Steven Petronio filed the
instant action against defendants National Railroad Passenger
Corporation ("Amtrak") and Steven John Collins, alleging that
the defendants violated the whistleblower protection provisions
of the Federal Railroad Safety Act ("FRSA") when they terminated
Petronio's employment with Amtrak. ECF No. 1. On July 18, 2019,
the defendants moved for summary judgment. ECF No. 20. For the
reasons stated below, the Court grants the motion in its
entirety.

## Background

Except where otherwise noted, the following undisputed
facts are taken from the parties' Rule 56.1 Statements.

Steven Petronio began his employment with Amtrak around
January 2012. Defendants' Rule 56.1 Statement in Support of
Summary Judgment, ECF No. 25 ("Defendants 56.1 Statement") ¶ 1.

In 2015, Petronio started working as a pipefitter for the Building Department at the New York Pennsylvania Station ("Penn Station"). Id. ¶ 4. He was also a member of the Sheet Metal, Air, Rail and Transportation Workers Union ("SMART"), and, in July 2017, he was elected as a local chairman of the union. Id. ¶ 6.

In September and October 2017, Petronio reported several safety concerns at Penn Station via e-mail to upper-level management officials within the Building and Bridges and Engineering Departments. Id. ¶ 6. Specifically, he (1) requested training for pipefitters working at Penn Station in fall protection, confined space, and main lift operation, (2) reported cracked floor plates on the lower level of Penn Station's service plant, and (3) requested that Amtrak build a second means of egress in Penn Station Heater Rooms 1 and 2. Id. ¶¶ 8-12.

Contemporaneously, in or about the Fall of 2017, Amtrak was making major staff changes at Penn Station. Id. ¶ 14. Pursuant to Rule 2 of the applicable collective bargaining agreement, if a senior craftsman's position was eliminated, he or she had the right to "bump" (i.e., replace) a junior craftsman for the junior craftsman's shift or position. Id. ¶ 15. In early November 2017, Zachary Gobin, a pipefitter and SMART member,

2

discussed with Petronio about wanting to bump Charlie Hall, a sheet metal technician, and Petronio spoke to Thomas Hall, the Supervisor of the Fire Life Safety Department ("FLSD"), about it. Id. ¶¶ 16-17. Thomas Hall was hesitant, as he believed there was a special arrangement between SMART and FLSD that precluded bumping of sheet metal technicians and because he did not believe Gobin was qualified for the sheet metal technician position. Id. ¶¶ 18-19. Petronio disagreed on both points. Id. ¶ 20.

On November 7, 2017, Petronio went to Thomas Hall's office to discuss the bumping issue once more. Id. ¶ 23. The two disagreed again, and at some point Hall stated that "if [Petronio] disagreed, then he should file a grievance with Amtrak's Labor Relations." Id. ¶¶ 24-28. The parties dispute as to how Petronio responded: according to Petronio, he said, "If I have to call Labor Relations it's going to get ugly," Transcript of Steven Petronio Deposition, ECF No. 21-2, Ex. B ("Petronio Dep.") 130:19-20; and according to the defendants, Petronio responded, "it's gonna get real ugly for you around here," Transcript of Thomas Hall Deposition, ECF No. 21-8, Ex. H ("Hall Dep.") 54:13-55:4. Hall claims that, based on the words and Petronio's demeanor, he felt that Petronio may have been making a threat against him. Defendants 56.1 Statement ¶ 31.

3

After Petronio left the room, Hall discussed this incident with Matthew McGuiness, another person in the room during Hall's interaction with Petronio. Id. ¶ 33. Both Hall and McGuiness concluded that they were not sure what Petronio actually meant by his statement but believed it could have been a threat against Hall. Id. Accordingly, Hall and McGuiness told Steven John Collins, the Assistant Division Engineer at the Penn Station Facilities, about the incident, after which Collins called Susan Obey, a charging officer for the Engineering Department, to get her advice on what to do with the situation. Id. ¶¶ 34, 38. Obey advised Collins that they should first ask Petronio to explain what he had meant by his statement before taking any further action. Id. ¶ 40.

Collins scheduled a meeting on the same day with Petronio "to hear his side of the story" before determining whether Petronio's remark violated Amtrak's Workplace Violence Policy. Id. ¶ 43. The meeting took place, but the parties disagree as to what Collins exactly said at the meeting, whether Petronio raised his voice and spoke in a threatening tone, and whether Collins and Hall threatened Petronio. See Hall Dep. 90:12-19, 90:22-91:18; Transcript of John Collins Deposition, ECF No. 21-10, Ex. J ("Collins Dep.") 89:18-90:15, 91:20-92:5; Petronio Dep. 146-52. At some point, Petronio asked Hall, "so we're gonna

4

go that route?" Defendants 56.1 Statement ¶ 50. Collins ended the meeting abruptly, and Hall called a police officer to escort Petronio out of Collins' office and to gather his belonging from the locker room. Id. ¶¶ 53-54. Collins then reported the incident to Obey, and Collins withheld Petronio from service effective immediately. Id. ¶ 55.

On November 9, 2017, Obey charged Petronio with a violation of both Amtrak's Standards of Excellence – which discourages "boisterous conduct such as fighting, rudeness, assault, intimidation, horseplay, and using profane or vulgar language" – and Amtrak's Workplace Violence Policy – which states that "Amtrak has a zero tolerance for threats and violence," where "workplace violence" is defined as "any intentional verbal or physical conduct affecting the workplace that causes any individual to reasonably fear for his or her personal safety." Id. ¶ 59; Amtrak's Workplace Violence Policy, ECF No. 27-3, Ex. 8 ("Amtrak WVP") ¶ 5.0. Obey sent Petronio a Notice of Investigation scheduling a disciplinary hearing. Id.

On December 5, 2017, the disciplinary hearing was held, with Frances Krische presiding as the hearing officer. Krische declares that she "had no [prior] dealings regarding the subject matter of the hearing with Petronio or with any of the individuals who appeared at the Hearing to offer testimony or

other evidence." Declaration of F. Krische in Support of Defendants' Motion for Summary Judgment, ECF No. 23 ("Krische Decl.") ¶ 3. In particular, there is no evidence whatsoever that Krische was aware of any of Petronio's safety reports or any safety issues, and his safety reports were not discussed at the hearing. Defendants 56.1 Statement ¶ 74. During the hearing, Petronio was represented by John McCloskey, the General Chairman of SMART, and Amtrak was represented by Obey with Hall, McGuiness, and Collins called as Amtrak's witnesses. Id. ¶¶ 67-68.

On December 12, 2017, Krische issued a Decision Letter stating that Amtrak had established by substantial evidence that Petronio threatened Hall on November 7, 2017 and violated Amtrak's Workplace Violence Policy. Id. ¶ 76. This letter was forwarded to Andrew Keefe, Assistant Vice President of Engineering Maintenance, who recommended that Amtrak terminate Petronio's employment based on Petronio's violation of the Amtrak policies. Id. ¶¶ 78, 84. Keefe declares that he did not speak with any individual involved in Petronio's disciplinary proceedings other than Obey, and then only to ask about any mitigating circumstances or any unusual testimony to consider in making his recommendation. Declaration of A. Keefe in Support of Defendants' Motion for Summary Judgment, ECF No. 22 ("Keefe

6

Decl.") ¶¶ 4-5. Once again, there is no evidence whatsoever that Keefe and Obey were aware of Petronio's safety reports. Defendants 56.1 Statement ¶ 82-83.

Obey drafted and sent a Notice of Discipline setting forth the effective termination of Petronio's employment to Robert Puciloski, the New York Division Engineer, who signed it on December 14, 2017. Id. ¶ 85-87, 90.[1]

On January 2, 2018, Petronio filed an appeal of his December 14, 2017 termination with the Manager of Labor Relations, Field Operations. Defendants 56.1 Statement ¶ 91. On February 14, 2018, Petronio's appeal was denied. Id. ¶ 92. The denial stated that "the discipline of dismissal was not an arbitrary, capricious, or excessive assessment but rather an appropriate and fully warranted decision." Id.

On March 1, 2018, Petronio appealed the February 14, 2018 denial to the highest designated Labor Relations official, who in turn also denied Petronio's appeal and affirmed the termination. Id. ¶¶ 95-96. This denial letter noted that

---

[1] Petronio admits that "Puciloski was not aware of Petronio's safety reports until September 2018" (i.e., 9 months later), but elsewhere he contends that (suspectful) "circumstantial evidence demonstrates that Amtrak managers, including Mr. Puciloski, were aware of Mr. Petronio's safety concerns." Plaintiff's Response to Amtrak's and Collins' Rule 56.1 Statement, ECF No. 28 ("Petronio 56.1 Response") ¶¶ 88-89.

Petronio "believes that he is being retaliated against for raising safety concerns on the property" but rejected this argument because "there was no evidence of any reporting of safety concerns within the record." Id. ¶ 98.

On May 1, 2018, Petronio filed a complaint with the U.S. Department of Labor, and, on November 1, 2018, the Occupational Safety and Health Administration ("OSHA") issued a determination dismissing the complaint, finding that there was "no reasonable cause to believe [Amtrak] violated FRSA" and that Amtrak had "demonstrated by clear and convincing evidence [that it] would have taken the same adverse action absent Complainant's protected activities." Id. ¶¶ 99-100.

On November 26, 2018, Petronio filed an appeal of OSHA's determination to an administrative law judge. Id. ¶ 101. Subsequently, however, he dropped this appeal in favor of his option of pursuing his FRSA claim in federal court. Id. ¶ 101.

Separately, however, on or about November 14, 2018, Petronio had also filed a claim for arbitration before the Public Law Board, which was presented with the entire record of the December 5, 2017 hearing, as well as extensive briefing. Id. ¶¶ 102-03. Petronio's union also presented oral argument in support of his appeal on February 21, 2019. Id. However, on March 4, 2019, the Public Law Board issued an award letter

8

denying Petronio's claim and stating that "substantial evidence proved that [Petronio] did, in fact, make a threat in Hall's office" and stating that Petronio violated Amtrak's Workplace Violence Policy. Id. ¶ 104. The Public Law Board also noted that "employers cannot afford to take any risks with employees who display the kind of anger that [Petronio] displayed on November 7." Id. ¶ 105.

On January 7, 2019, Petronio filed the instant FRSA action. ECF No. 1. Now before the Court is the defendants' motion for summary judgment. ECF No. 20. The defendants argue that (1) Petronio cannot establish that his safety reports were a contributing factor in his termination and (2) if this Court finds that they were a contributing factor, clear and convincing evidence demonstrates that Amtrak would have terminated Petronio even without the safety reports. Defendants' Memorandum of Law Supporting Summary Judgment ("Defendants SJ Mem."), ECF No. 26, at 12-21. Petronio opposes. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Petronio SJ Opp."), ECF No. 27. On August 30, 2019, the Court held an oral argument on the instant motion, during which it directed the parties to submit supplemental briefs addressing (1) whether the adverse action element of a retaliation claim brought pursuant to the FRSA is met as soon as a railroad employee is

9

served with disciplinary charges and (2) any additional issues
that the parties wanted to discuss. Both parties then filed
supplemental briefs. See Plaintiff's Supplemental Memorandum of
Law in Opposition to Defendants' Motion for Summary Judgment,
ECF No. 31 ("Petronio Supp."); Defendants' Supplemental
Memorandum of Law in Further Support of Summary Judgment, ECF
No. 32 ("Defendants Supp.").

## **Analysis**

### I. **Legal Standards**

Under Rule 56(a) of the Federal Rules of Civil Procedure, a
"court shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." "The movant
bears the burden of demonstrating the absence of a genuine
dispute of fact, and, to award summary judgment, the court must
be able to find after drawing all reasonable inferences in favor
of a non-movant that no reasonable trier of fact could find in
favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC,
204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[2] It is well established
that "credibility assessments, choices between conflicting

---

[2] Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

10

versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003).

The FRSA makes it unlawful for railroad carriers to "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part" to the employee's engagement in activity protected by the FRSA. 49 U.S.C. § 20109(a). The protected activities include reporting a hazardous safety condition. Id. § 20109(b)(1)(A). These FRSA whistleblower protection provisions incorporate the procedures enacted by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B), which include a two-step burden-shifting framework:

> To prevail . . . , an employee must prove by a preponderance of the evidence that (1) []he engaged in protected activity; (2) the employer knew that []he engaged in the protected activity; (3) []he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. If the employee establishe[s] these four elements, the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior.

Bechtel v. Admin. Review Bd., U.S. Dep't of Labor, 710 F.3d 443, 447 (2d Cir. 2013) (emphasis added); see also Lockhart v. Long

11

Island Railroad Company, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017). At this summary judgment stage, the parties disagree as to whether Petronio's protected activity was a contributing factor in the decision to terminate his employment (i.e., the fourth prong of the first step) and, if it were, whether the defendants can prove by clear and convincing evidence that they would have terminated Petronio in the absence of that protected behavior (i.e., the second step).

The Court grants summary judgment in favor of the defendants because, based on the available facts and after drawing all reasonable inferences in favor of Petronio, Petronio fails to prove by preponderance of the evidence that the fourth prong of the first step is established. For that reason, the Court does not reach the second step.

## II. Which legal standard to apply in evaluating whether a protected activity was a contributing factor

There is a circuit split over which legal standard to apply in evaluating whether a protected activity was a contributing factor in an unfavorable employment decision. The Seventh and Eight Circuits hold a view that a plaintiff must prove "intentional retaliation" prompted by the employee engaging in protected activity. See Armstrong v. BNSF Ry. Co., 880 F.3d 377, 382 (7th Cir. 2018); Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791

12

(8th Cir. 2014). The First, Third, Fourth, Sixth, Ninth, and
Tenth Circuits do not seem to require proof of "intentional
retaliation" as such. See Pan. Am. Railways, Inc. v. U.S. Dep't
of Labor, 855 F.3d 29, 33-35 (1st Cir. 2017); Araujo v. New
Jersey Transit Rail Operations, Inc., 708 F.3d 152, 158-59 (3d
Cir. 2013); Lowery v. CSX Transp., Inc., 690 F. App'x 98, 101
(4th Cir. 2017); Consol. Rail Corp. v. U.S. Dep't of Labor, 567
F. App'x 334, 338 (6th Cir. 2014); Frost v. BNSF Railway Co.,
914 F.3d 1189 (9th Cir. 2019); BNSF Ry. Co. v. U.S. Dep't of
Labor, 816 F.3d 628, 639-40 (10th Cir. 2016). And the Second
Circuit has yet to address the issue.

    However, it is not necessary to address this split here
either, because, even assuming the more "plaintiff-friendly"
latter standard applies, the defendants' motion for summary
judgment should still be granted.

## III. Whether Petronio's safety reports were a contributing factor in Amtrak's decision to terminate his employment

    Under the standard more favorable to plaintiff, a
"contributing factor" is "any factor, which alone or in
connection with other factors, tends to affect in any way the
outcome of the decision." Araujo, 708 F.3d at 158; Rookaird v.
BNSF Railway Co., 908 F.3d 461 (9th Cir. 2018).

13

Here, there is no sufficient evidence of record that would warrant a reasonable fact-finder to find that Petronio's complaints could have affected "in any way the outcome of the decision." Araujo, 708 F.3d at 158. The Amtrak policy violations that led to Petronio's termination were determined by Kirsche, the hearing officer, following the December 5, 2017 hearing. There is no direct or circumstantial evidence that Kirsche had any knowledge of Petronio's safety complaints. Defendants 56.1 Statement ¶ 74; Petronio 56.1 Response ¶ 74. The decision to terminate Petronio was made by Keefe, and Keefe did consult Obey in rendering his decision. But, again, there is no direct or circumstantial evidence that either Obey or Keefe was aware of Petronio's safety reports. Defendants 56.1 Statement ¶¶ 82-83; Petronio 56.1 Response ¶¶ 82-83. Puciloski – who signed Petronio's termination letter – was not aware of Petronio's safety reports until nine months after Petronio's termination. Defendants 56.1 Statement ¶ 88; Petronio 56.1 Response ¶ 88.

Collins, the only person who both participated in the overall termination process and had the direct knowledge of Petronio's safety reports at the time of termination, simply

14

testified as a witness during the disciplinary hearing.[3]

Defendants 56.1 Statement ¶¶ 68, 70-71; Petronio 56.1 Response ¶¶ 68, 70-71. And there is no evidence that he communicated his knowledge of the safety reports to the decision-makers here in any way, let alone in a "manner that might have influenced their discharge decision." Kuduk, 768 F.3d at 791. Nor is there any evidence supporting that he altered his testimony because of the safety reports, which would be a fairly far-fetched inference in any event.[4] Indeed, there appears to be no evidence of any reporting of safety concerns within the hearing records. See Trans. of Amtrak Hearing dated December 5, 2017, ECF No. 21-17, at Ex. Q ("Hearing Transcript"); Letter from C. Richtarich to

---

[3] Petronio sent the emails regarding safety reports to Bryan A. Tyska, Juan Rodriguez, Robert McCarthy, Stephen Wilchek, Collins, and individuals with email addresses MikhailBlanco@yahoo.com, PatchLocal149@gmail.com, ThomasElizabeth24@gmail.com, RollinsA68@gmail.com, and JMcCloskey@smart-gc2.org. Email from Steven Petronio dated September 4, 2017, ECF No. 21-5, Ex. E; Email from Steven Petronio dated September 11, 2017, ECF No. 21-6, Ex. F; Email from Steven Petronio dated October 9, 2017, ECF No. 21-7, Ex. G. Petronio states that he also communicated some of these conditions personally to Tony Siegler. Plaintiff's Local Rule 56.1(b) Counterstatement of Material Facts, ECF No. 27-1 ("Petronio 56.1 Counterstatement") ¶ 6.

[4] This holding is further supported by this Court's observation that Collins' testimony appears more or less consistent with that of McGuiness and Hall. See Hearing Transcript.

15

John McCloskey, Re: SMW-461-D – Steven Petronio, ECF No. 21-24, Ex. X, at 4.

Petronio insists that Collins' knowledge alone is enough to establish the contributing factor element, based on the "cat's paw" principle of evidence that a decision maker need not have direct knowledge of a plaintiff's protected activity so long as another manager with direct knowledge played a meaningful role in the decision making process. Petronio SJ Opp. 17-18. Under this theory, Petronio argues, it does not matter that Collins was not a final executioner. Id. at 18-19.

But there is not remotely enough factual support to apply the cat's paw principle in the present case. For the cat's paw principle to apply, there needs to be, at minimum, some evidence that the "individual shown to have the impermissible bias" has "played a meaningful role in the decisionmaking process." Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 272 (2d Cir. 2016);[5] see also Staub v. Proctor Hospital, 562 U.S. 411, 421 (2011). For this reason, the circumstance where the cat's paw principle applies generally involves "the supervisor advising the decision-maker or being intimately involved in the

---

[5] Vasquez discusses the cat's paw theory in an employment discrimination context, which this Court finds also applicable to this FRSA context.

16

decision." Niedziejko v. Delaware & Hudson Ry. Co., No. 18-cv-0675 (GTS) (CFH), 2019 WL 1386047, at *41 (N.D.N.Y. Mar. 27, 2019); see also Lowery v. CSX Transp., Inc., 690 F. App'x 98, 100 (4th Cir. 2017); Johnston v. BNSF Ry. Co., 15-CV-3685, 2017 WL 4685012, at *8 (D. Minn. Oct. 16, 2017).

Here, by contrast, there is, first, no factual record directly or circumstantially suggesting that Collins harbored some impermissible bias – to be distinguished from Collins' knowledge of the safety reports – in bringing the charge or testifying at the hearing. And second, the fact that Collins offered testimony at the hearing is insufficient to credit a cat's paw theory that Collins – or anyone else allegedly with "the impermissible bias" – played a "meaningful role" in Amtrak's termination decisionmaking process. Defendants SJ Reply 6; see also Gunderson v. BNSF Ry. Co., 850 F.3d 962, 970 (8th Cir. 2017) (rejecting cat's paw theory where the supervisors participated in the investigations and testified at the disciplinary hearings, because there was no evidence that [the supervisors] influenced the discharge decision of the ultimate decision-maker); Kuduk v. BNSF Ry. Co., 768 F.3d 786, 790-91 (8th Cir. 2014) (rejecting cat's paw theory where the supervisor merely participated as a witness at the hearing that led to the plaintiff's discharge and there was "no evidence [that the

17

supervisor] advised the decision-makers ... [or] influenced their discharge decision").

Alternatively, Petronio argues that the "adverse action" element of a retaliation claim brought pursuant to the FRSA was met as soon as Petronio was served with disciplinary charges by Collins. Petronio Supp. 2. Given that there is no circuit court authority on whether charging alone satisfies the adverse action element in the context of the FRSA claim, the Court follows the following rule articulated by the U.S. Supreme Court in the context of Title VII cases: (1) "adverse action" in a retaliation case includes any action "materially adverse" to the employee's interest; and (2) an employer's action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006). In other words, bringing a disciplinary charge alone, in and of itself, does not automatically constitute an adverse action, although it can constitute one if such action "would dissuade a reasonable employee" from engaging in the protected conduct. This approach is consistent with how various other district courts addressed the issue in the FRSA context. See, e.g., Renzi v. Union Pacific Railroad Co., 2018 WL 3970149, at *4-5 (N.D. Ill. Aug. 20, 2018); Brisbois v. Soo Line R.R.

18

Co., 124 F. Supp. 3d 891, 903 (D. Minn. 2015).[6] And as the defendants concede, the record may support finding a triable issue of fact on the narrow issue of whether Petronio suffered an adverse action when Collins removed him from service and set in motion a formal disciplinary investigation on November 7, 2017 that eventually led to Petronio's termination. See also Short v. Springfield Terminal Railway Co., 2017 WL 3203391, at *3 (D. Maine, July 26, 2017).

Nonetheless, Petronio's claims fail as a matter of law because, going back to the contributing factor element, there is no evidentiary record that supports a finding, either directly or circumstantially, that Collins' awareness of Petronio's safety reports played any role in Collins' decision to initiate the disciplinary investigation. Collins' involvement started not because of Collins' own initiative, but because of Petronio's argument with Hall on November 7, 2017. Defendants 56.1 Statement ¶¶ 37-43; Petronio 56.1 Statement ¶¶ 38, 40-43. Once Collins found out about the November 7, 2017 incident, he did not act on his first opportunity to charge Collins, but instead first (1) consulted Obey, charging officer, as to how Collins should proceed and (2) decided to meet with Petronio and Hall to

---

[6] The parties both largely agree with this approach as well. See Petronio Supp. 2-3; Defendants Supp. 2-3.

19

hear about his side of the story before deciding whether to pursue any formal charge. Defendants 56.1 Statement ¶¶ 34, 38, 40, 43; Petronio 56.1 Statement ¶¶ 34, 38, 40, 43. When Collins and Petronio met, they had a heated exchange where they subsequently accused each other of being rude, argumentative, and not letting the other person speak. Collins Dep. 90-92, 97; Defendants 56.1 Statement ¶¶ 46-52; Petronio 56.1 Counterstatement ¶¶ 34-39. Nothing in that meeting supports a finding that this heated exchange was somehow connected to Petronio's safety reports. Petronio Supp. 6. In sum, there is no reasonable factual support - either direct or circumstantial - to bridge the gap between Collins' knowledge of the safety reports and Petronio's argument that Collins' charging decision, let alone Collins' testimony at the hearing, was somehow affected by Petronio's safety reports.

For these reasons, the Court grants summary judgment in favor of the defendants on the issue of whether Petronio's safety reports was a contributing factor in the adverse employment action against him. It follows that, because Petronio fails to establish one of the elements of the FRSA claim, summary judgment is warranted in favor of the defendants in the instant action. Accordingly, the Court hereby grants the motion

for summary judgment in favor of the defendants and dismisses the complaint in its entirety, with prejudice.

The Clerk of the Court is directed to enter final judgment and to close the entry at docket number 20.

SO ORDERED.

Dated:    New York, NY

September 30, 2019

JED S. RAKOFF, U.S.D.J.

21